*Roseberline Turenne v. State of Maryland*, No. 714, September Term 2022.  Opinion by Wells, C. J.

**CRIMINAL LAW — CHILD PORNOGRAPHY — SEXUAL CONDUCT— "LASCIVIOUS EXHIBITION OF THE GENITALS" — STANDARD**

In 2019, the General Assembly added "lascivious exhibition of the genitals or pubic area of any person" to its definition of sexual conduct but left the word "lascivious" undefined. We decline to adopt either the federal courts' leading definition of the term, or a minority's definition. Instead, we adhere to a "totality of the circumstances" approach to determine whether a photograph depicting a child's genitals constitutes "lascivious exhibition" as now codified in the statute.

**CRIMINAL LAW — CHILD PORNOGRAPHY — SEXUAL CONDUCT— "LASCIVIOUS EXHIBITION OF THE GENITALS" — SUFFICIENCY OF THE EVIDENCE**

The evidence, taken in the light most favorable to the State, against the defendant, Roseberline Turenne, was sufficient to sustain her convictions for child pornography. The evidence showed that she had taken close-up photographs of the vaginas of several toddlers who were her charges at a daycare where Ms. Turenne worked under circumstances from which the jury could rationally infer she derived sexual gratification from the images.

Circuit Court for Wicomico County
Case No. C-22-CR-21-000263

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 714

September Term, 2022

_____

ROSEBERLINE TURENNE

v.

STATE OF MARYLAND
_____

Wells, C.J.,
Arthur,
Eyler, James R.
  (Senior Judge, Specially Assigned),

JJ.

_____

Opinion by Wells, C.J.
_____

Filed: June 28, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials Act (§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Gregory Hilton, Clerk

*At the November 8, 2022 general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Special Appeals of Maryland to the Appellate Court of Maryland. The name change took effect on December 14, 2022.

This case arises out of the State's recovery of eight images of children's genitalia taken by and stored on the cell phone of appellant, eighteen-year-old Roseberline Turenne. Turenne was charged in the Circuit Court for Wicomico County with eight counts of sexual abuse of a minor, eight counts of knowingly allowing a minor to engage as a subject in a visual representation that depicts a minor engaged as a subject in sexual conduct, and eight counts of possession of child pornography. A jury convicted Turenne of all counts, and the court sentenced her to 280 years of incarceration with all but 126 years suspended, followed by five years of probation, and lifetime registration as a sex offender. Turenne timely appealed and submits the following issues for our review, which we have slightly rephrased[1]:

1.  Was the evidence insufficient to sustain Turenne's convictions?

2.  Did the court plainly err by failing to instruct the jury on the meaning of "lascivious exhibition" relating to the child pornography charges, and "sexual exploitation" relating to the sexual abuse of a minor charge?

3.  Did the court plainly err by allowing the prosecutor to say in closing arguments that the jury should consider Turenne's sexual orientation as evidence that she took the photos for sexual gratification?

For the reasons that follow, we affirm.

---

[1] Turenne's questions presented, verbatim, read:

1.  Was the evidence sufficient to sustain Appellant's convictions?

2.  Did the court plainly err by failing to adequately instruct the jury on the elements of the offenses?

3.  Did the court plainly err by allowing the prosecutor to impermissibly appeal to the prejudices of the jury by relying on homophobic tropes?

**FACTUAL AND PROCEDURAL BACKGROUND**

In June 2021, Turenne worked as a teacher's aide in the daycare center Stepping Stones Early Learning Center in Salisbury, Maryland. She worked primarily in a classroom with toddlers (children ranging in age from approximately fourteen months to two years) but floated between classes as needed. Turenne's duties included changing and feeding the children and getting them ready for naps. She typically worked from 8:30 a.m. to 5:30 p.m. There was almost always a senior teacher in the classroom, but teachers would begin to leave around 4:30 p.m. and children could be picked up as late as 6 p.m. Stepping Stones employees were prohibited from taking pictures of the children and using their phones outside of the breakroom.

On June 10, 2021, Turenne was with another aide, Nadasia Miller, in the daycare center's breakroom. Turenne handed Miller Turenne's phone to show her an online adult pornographic video that Turenne had downloaded to her phone. After watching the video clip, Miller examined the camera roll on Turenne's phone and saw multiple pictures of children's vaginas. Miller recognized that the images depicted a changing table and a bathroom in Stepping Stones. Miller did not confront Turenne, but returned Turenne's phone to her and immediately reported what she saw to Stepping Stones' manager, Barbara Brittingham. Brittingham immediately contacted Child Protective Services.

Detective Rockwell and Social Worker Amy Kelly of the Wicomico County Child Advocacy Center arrived at Stepping Stones that same afternoon. In an empty room provided by Brittingham, Detective Rockwell and Kelly interviewed Turenne. With

Turenne's consent, Rockwell took Turenne's phone and looked through the camera roll alongside her. He saw the photos that Miller had described. When Detective Rockwell acknowledged the photos, stating they were of children, Turenne disagreed and said they were of adults and came from Google. Turenne then stated the photos were from Tik Tok, or that they had been sent to her and automatically downloaded to her phone through the application WhatsApp. Sometime after Turenne offered those explanations, Detective Rockwell left the room and inspected and photographed the changing tables in the daycare center. He confirmed that they were the same changing tables in the photos on Turenne's phone. When Detective Rockwell returned to the room where Turenne and Kelly were still seated, he asked Turenne if she had taken the photos inside the daycare. Turenne admitted to taking the photos in the daycare but repeatedly stated she took them "for no reason."

### *Trial Court Proceedings*

#### A. Photo Evidence

Turenne was charged in the Circuit Court for Wicomico County with 24 counts relating to eight images found on her phone: counts 1 through 8 for sexual abuse of a minor, Md. Code Ann., Crim. Law (CR) § 3-602(b)(1); counts 9 through 16 for knowingly permitting a minor to engage as a subject in a visual representation that depicts a minor engaged as a subject in sexual conduct, CR § 11-207(a)(1); and counts 17 through 24 for possession of child pornography, CR § 11-208(b)(2). The eight photos were admitted into evidence. An extraction of Turenne's phone's contents demonstrated that the photos were taken between February and April 2021, and six of them were taken between 4:30 and 5:30

p.m., one at 7:22 p.m., and one at 11:08 a.m. Seven of the photos show the children on the changing table, and one shows a child standing up. All of the photos had zoomed in to focus on the children's unclothed vaginas; none included a child's face. Turenne testified to being able to see rashes (or diaper cream she had applied to a rash) in five of the photos. Conversely, the State, in closing, commented that many of the images do not appear to show any diaper rash, but acknowledged that was for the jury to review.

## B. Testimony

Turenne testified in her own defense. She stated that she took the photos following a parent's complaint about a child coming home with diaper rash. Turenne explained that the purpose of the photos was to demonstrate that the children had diaper rash "before she came in or before she was leaving." Turenne explained that she did not tell Detective Rockwell that she took the photos at Stepping Stones because once he asked her about child pornography, she became afraid of getting in trouble and getting deported.[2] Turenne also testified that she had initially thought Detective Rockwell was asking her about the adult pornographic photos on her phone, which is why she responded that they were not photos of children but adults. She said the images had come from WhatsApp—an app where other individuals would send her adult pornographic photos and they would automatically download to her camera roll.

On cross-examination, Turenne admitted that she would not be able to identify the children by the faceless photos she took, if a parent was to complain about their child

---

[2] Turenne is a Haitian immigrant.

having diaper rash. Turenne also testified that she did not recall any parent approaching her about diaper rash, and that she did not see diaper rashes on any of the boys, which is why she only had pictures of girls. She also testified that she had not seen any other staff taking photos of children's diaper rash. Turenne stated she did not recall telling Detective Rockwell that one of the photos of a child on a changing table came from Google, as Detective Rockwell claimed.

Brittingham also testified. She stated that she had never asked staff to take pictures to document any diaper rash on children or infants attending the daycare center, and that doing so would be in violation of the policy forbidding taking pictures of children. She also testified that she had never reprimanded a teacher or an assistant for a child having a diaper rash.

Prior to trial, Brittingham provided Detective Rockwell with Turenne's punch card documenting her hours, as well as logs of children's arrivals and departures from the daycare center and diaper changes for children under two years. Detective Rockwell used these items to attempt to identify the children in the photos but was only able to identify two children based on pieces of clothing captured in the photos. A parent of one of the identified children testified that she had never complained to the daycare about her child having diaper rash.

Detective Rockwell also testified. He explained that aside from the photos of the children's vaginas, there were no other photos of the children engaged in sexual acts or contact, or internet searches for child pornography, on Turenne's phone. Detective

5

Rockwell did recount that "there's plenty of other things on the phone in regards to, like, pornography":

> There was, uh . . . to be politically correct, I guess, there was female pornography, there was heterosexual pornography, there was pictures of vaginas, of breasts, there were pictures of male penises. So there was an array of different types of pornography in the phone.

The State asked Turenne if it was true that she had told Nadasia Miller that she was attracted to women. Turenne answered that she did not recall telling Miller that.[3] The State then asked Turenne if it was a fair statement that she was attracted to women, to which Turenne responded that she was bisexual, or "confused" about whether she liked men or women, "[b]ut not children, no."

## C. Jury Instructions

Regarding the child sex abuse charge, the court instructed the jury using modified pattern instructions:

> The defendant is charged with the crime of child sexual abuse. Child sexual abuse is sexual exploitation of a child under 18 years of age caused by a person with temporary care, custody, or responsibility for supervision of a child. In order to convict the defendant of child sexual abuse, the State must prove
>
> (1) That the defendant sexually abused (name) by other sexual offense or sexual exploitation;
> (2) That at the time of abuse, (name) was under 18 years of age; and
> (3) That at the time of the abuse, the defendant was a person with temporary responsibility for the supervision of (name).
>
> In order to convict the defendant, you must all agree that the defendant sexually abused (name), but you do not have to all agree on which specific act or acts constituted the abuse.

---

[3] Miller testified that Turenne had told her that she was attracted to women.

6

Abuse does not include the performance of an accepted medical or behavior procedure ordered by a health care provider authorized to practice by law and acting within the scope of that authorization.

In the absence of pattern instructions for child pornography, the trial court gave the following instruction on the production of child pornography charge, in relevant part:

In order to convict the defendant, the State must prove that the defendant knowingly allowed a minor to engage as a subject in a visual representation that depicts a minor engaged as a subject in sexual conduct. Sexual conduct means lascivious exhibition of the genitals or pubic area of any person.

Likewise, the court gave the following instruction for the possession of child pornography charge, in relevant part:

In order to convict the defendant the State must prove that the defendant knowingly possessed and intentionally retained a photograph showing an actual child under the age of 16 years engaged in sexual conduct. Sexual conduct, again, is defined as lascivious exhibition of the genitals or pubic area of any person.

Both parties responded that they were satisfied with the instructions provided.

## D. Closing Arguments

In describing the requirements for finding sexual exploitation as the manner of sexual abuse in closing, the prosecutor said:

So you can consider sexual exploitation by looking at the images themselves. And I think it's pretty self-explanatory when you're looking at, I don't know why we need to discuss the intent when you look at the pictures itself, but I think the pictures themselves are hard to look at because they're just zoomed in on a child's crotch.

The prosecutor then described the pictures, arguing that most of the photos did not show any diaper rash. The prosecutor continued:

7

So other than the pictures themselves, which I think speak for themselves as to her intent, you can look at the circumstances during which she took these pictures, of how the pictures were taken.

The prosecutor noted that the pictures were taken primarily at times when there were few other adults around at the daycare, and how the photos were "sort of intertwined with other adult porn" in Turenne's camera roll.

### E. Juror Deliberations and Note

Deliberations began at 12:35 p.m. At 12:57 p.m., the jurors sent a note, which read:

Under what condition could the defendant be guilty of child abuse – sexual abuse and not be guilty of the other charges?

If it is determined that the pictures were sexual exploitation [then] wouldn't that determine the next 2 charges?

At 1:23 p.m., the court addressed the note with the parties. The judge explained he thought it was "important for the [c]ourt to provide some clarity, the [c]ourt can't play ostrich when it knows that there's a question like this." The judge proposed calling the jurors back out, reading the three substantive instructions again, as well as the instruction for the jurors to separately consider each charge, and the distinct elements of each charge. Before the court could respond to the jury however, they reached a verdict. Neither party asked that the jury still receive the court's answer to its inquiry. The record reflects that after the court asked the parties if they were "ready to bring the jury out to receive the verdict?," defense counsel responded, "Yes, Your Honor." The jury returned at 1:30 p.m. and convicted Turenne of all counts. Turenne timely appealed.

We will supply additional details where they are relevant to our analysis.

## DISCUSSION

## I. Sufficiency of the Evidence

## Standard of Review

"When reviewing the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the State and assess whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Krikstan*, 483 Md. 43, 63 (2023) (quoting *Walker v. State*, 432 Md. 587, 614 (2013)).

> Our role is not to review the record in a manner that would constitute a figurative retrial of the case. This results from the unique position of the fact-finder to view firsthand the evidence, hear the witnesses, and assess credibility. As such, we do not re-weigh the credibility of witnesses or attempt to resolve any conflicts in the evidence. Our deference to reasonable inferences drawn by the fact-finder means we resolve conflicting possible inferences in the State's favor, because we do not second-guess the jury's determination where there are competing rational inferences available.

*Id.* at 63–64 (internal citations and quotations omitted) (cleaned up).

To the extent we must review the trial court's interpretation of statutes, our review is de novo, as these are matters of law. *Elsberry v. Stanley Martin Companies, LLC*, 482 Md. 159, 178 (2022).

### *Child pornography charges – "lascivious exhibition"*

## A. Parties' Contentions

Turenne first argues there is insufficient evidence that the photos at issue show children engaged in "sexual conduct" by "lascivious exhibition." To reach this conclusion, she contends this Court should adopt the interpretation of "lascivious exhibition" of the

9

District of Columbia Circuit Court of Appeals, interpreting a parallel federal statute, that "the minor's depicted conduct must connote lust and suggest a sexual act, such that the image is objectively sexual." In support of this, Turenne avers that (1) this interpretation is most consistent with the United States Supreme Court's construction of the phrase; (2) the definition of "lascivious" includes "lustful"; and (3) "lascivious" appears in a list of other sexual acts.

The State counters that this Court does not need to adopt a precise test for construing "lascivious exhibition" in this case, as there are plenty of factors present that would satisfy even a narrow construction of the phrase. Even so, the State posits that the approach adopted by seven circuits and many state courts interpreting similar statutes—applying the six *Dost*[4] factors—is more appropriate than the minority approach advanced by Turenne. The State concludes that applying the *Dost* factors yields a finding that the photos do constitute "lascivious exhibition."

**B. Analysis**

Turenne was charged under two Maryland statutes that criminalize conduct with respect to a minor involved in "sexual conduct": Sections 11-207(a)(1) and 11-208(b)(2) of the Criminal Law Article ("CR"). Section 11-207(a)(1) provides, in relevant part:

> A person may not . . . cause, induce, solicit, or knowingly allow a minor to engage as a subject in the production of obscene matter or a visual

---

[4] *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986). This case and the factors will be discussed in detail in our analysis below.

representation or performance that depicts a minor engaged as a subject in .
. . sexual conduct[.]

And, CR § 11-208(b)(2) provides, in relevant part:

A person may not knowingly possess and intentionally retain a film,
videotape, photograph, or other visual representation showing an actual child
. . . engaged in sexual conduct[.]

"Sexual conduct" is defined in CR § 11-101(d), and in 2019 the General Assembly added

"lascivious exhibition of the genitals or pubic area of any person" to its definition:

"Sexual conduct" means:
(1) human masturbation;
(2) sexual intercourse;
(3) whether alone or with another individual or animal, any touching of or
contact with:
    (i) the genitals, buttocks, or pubic areas of an individual; or
    (ii) breasts of a female individual; or
**(4) lascivious exhibition of the genitals or pubic area of any person.**

CR § 11-101(d) (emphasis added); 2019 Maryland Laws Ch. 325 (H.B. 1027).

The parties here agreed that only paragraph (4) in the definition of "sexual conduct"

was at issue. Accordingly, in the trial court's instructions to the jury, it defined "sexual

conduct" using only this newest provision ("Sexual conduct means lascivious exhibition

of the genitals or pubic area of any person."). It did not provide any definition of "lascivious

exhibition" itself.

The Supreme Court of Maryland[5] noted that the purpose of the addition of

"lascivious exhibition" to the definition of "sexual conduct" was "to update the standard

---

[5] At the November 8, 2022, general election, the voters of Maryland ratified a constitutional amendment changing the name of the Court of Appeals of Maryland to the Supreme Court of Maryland. The name change took effect on December 14, 2022.

for 'sexual conduct' so that it was consistent with the federal standard and to close a loophole that prevented the prosecution of certain individuals in Maryland." *In re S.K.*, 466 Md. 31, 56 (2019). Indeed, testimony in support of the amendment suggests its purpose was to allow prosecution of "child pornographers who produce or possess images that are undeniably sexually explicit, but do not show active touching." Maryland Coalition Against Sexual Assault, Testimony Supporting H.B. 1027 with Amendment. *See also* Del. Lesley J. Lopez Letter to the Maryland House of Delegates, Support: HB 1027- Criminal Law- Child Pornography ("HB 1027 will strengthen our current child porn laws by elevating them to that of the federal standard. Specifically, we seek to include the phrase 'lascivious exhibition' to the definition of what constitutes sexual conduct. Lascivious exhibition essentially involves a sexual act or exhibition that does not involve actual physical or sexual contact with the victim."). The General Assembly did not include any legislation defining the phrase itself.

To date, no Maryland appellate courts have interpreted the "lascivious exhibition" provision and no Maryland pattern jury instructions define it.

The federal standard referenced in the legislative history above is found in 18 U.S.C. § 2256(A). That statute defines "sexually explicit conduct" as

> actual or simulated—
> (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;
> (ii) bestiality;
> (iii) masturbation;
> (iv) sadistic or masochistic abuse; or
> **(v) lascivious exhibition of the anus, genitals, or pubic area of any person**

12

18 U.S.C. § 2256 (emphasis added).

## The *Dost*-Factor Approach

In *United States v. Dost*, 636 F. Supp. 828 (S.D. Cal. 1986), the court articulated the following six factors for aiding in the determination of whether an image constitutes a "lascivious exhibition" under the federal statute:

1) whether the focal point of the visual depiction is on the child's genitalia or pubic area;

2) whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

3) whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

4) whether the child is fully or partially clothed, or nude;

5) whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

6) whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

*Id.* at 832 (S.D. Cal. 1986). The court followed that list with the proviso:

> Of course, a visual depiction need not involve all of these factors to be a "lascivious exhibition of the genitals or pubic area." The determination will have to be made based on the overall content of the visual depiction, taking into account the age of the minor.

*Id.* Seven circuits have since adopted—or at least recognized the frequent usefulness of—the *Dost* factors, albeit with varying degrees of flexibility, for determining whether an image is lascivious. *See United States v. Rivera*, 546 F.3d 245, 250 (2d Cir. 2008); *United States v. Knox*, 32 F.3d 733, 747 (3d Cir. 1994); *United States v. McCall*, 833 F.3d 560,

13

563 (5th Cir. 2016); *United States v. Stewart*, 729 F.3d 517, 527 (6th Cir. 2013); *United States v. Lohse*, 797 F.3d 515, 520 (8th Cir. 2015); *United States v. Hill*, 459 F.3d 966, 972 (9th Cir. 2006); *United States v. Wolf*, 890 F.2d 241, 245 (10th Cir. 1989). The Fourth Circuit has so far declined to adopt the factors,[6] stating that their application is unnecessary when lasciviousness can be found "based on the objective characteristics of the [images] alone." *United States v. Courtade*, 929 F.3d 186, 192 (4th Cir. 2019), as amended (July 10, 2019).

Even amidst their somewhat widespread adoption, the *Dost* factors have been criticized for their potential to limit too severely the material that constitutes child pornography. *Rivera*, 546 F.3d at 251 ("[*Dost*-factor critics'] underlying concern is that the factors sweep too narrowly"); *United States v. Wiegand,* 812 F.2d 1239, 1244 (9th Cir. 1987), ("[t]he [*Dost*-test] standard employed by the district court was over-generous to the defendant"); *United States v. Frabizio*, 459 F.3d 80, 88 (1st Cir. 2006) ("there is a risk that the *Dost* factors will be used to inappropriately limit the scope of the statutory definition."); *United States v. Wolf,* 890 F.2d 241, 245 n.6 (10th Cir.1989) ("We do not hold that more than one *Dost* factor must be present to constitute a violation of 18 U.S.C. § 2251(a).").

---

[6] The Fourth Circuit Court of Appeals did state in a 2017 opinion, "We likewise conclude that the *Dost* factors offer helpful guidance in determining whether conduct is lascivious, within the meaning of 18 U.S.C. § 2256(2)(A)[,]" but its order was later vacated on different grounds, *Sims v. Labowitz*, 877 F.3d 171, 182 (4th Cir. 2017), *on reh'g*, 885 F.3d 254 (4th Cir. 2018), and *reh'g granted, order vacated*, 714 F. App'x 289 (4th Cir. 2018), and it has not applied the test since.

The fifth factor—"whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity"—has been a specific target of criticism, since "[c]hildren do not characteristically have countenances inviting sexual activity," *Frabizio*, 459 F.3d at 89, and limiting "lascivious exhibitions" to those explicit displays would protect perpetrators who surreptitiously photograph or record children acting innocently, *United States v. Holmes*, 814 F.3d 1246, 1252 (11th Cir. 2016). The circuits utilizing the *Dost* factors appear to agree this factor is often irrelevant. *See, e.g.*, *Rivera*, 546 F.3d at 251 (citing and agreeing with conclusions from the First, Ninth, and Tenth circuits that the fifth factor "look[s] the wrong way").

The sixth *Dost* factor—"whether the visual depiction is intended or designed to elicit a sexual response in the viewer"—appears to present the most confusion and is applied differently among those circuits who use the factors. Critically, it gives rise to the questions on which Turenne's and the State's "lasciviousness" arguments turn:

> Is this a subjective or objective standard, and should we be evaluating the response of an average viewer or the specific defendant in this case? Moreover, is the intent to elicit a sexual response analyzed from the perspective of the photograph's composition, or from extrinsic evidence (such as where the photograph was obtained, who the photographer was, etc.)?

*United States v. Amirault,* 173 F.3d 28, 34 (1st Cir.1999). The Ninth Circuit, for instance, has held that it is enough to satisfy this factor for the image to have appealed to the sexual desires of the defendant. *Wiegand*, 812 F.2d at 1244 ("lasciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or likeminded pedophiles[,]" and "[i]t was a lascivious

15

exhibition because the photographer arrayed it to suit his peculiar lust."). Conversely, the

Third and Eighth Circuits have held that the images must objectively be of a sexual nature.

*United States v. Villard*, 885 F.2d 117, 125 (3d Cir. 1989) ("We must, therefore, look at

the photograph, rather than the viewer. If we were to conclude that the photographs were

lascivious merely because Villard found them sexually arousing, we would be engaging in

conclusory bootstrapping rather than the task at hand—a legal analysis of the sufficiency

of the evidence of lasciviousness."); *United States v. Kemmerling*, 285 F.3d 644, 646 (8th

Cir. 2002) ("We emphasize that the relevant factual inquiry in this case is not whether the

pictures in issue appealed, or were intended to appeal, to Mr. Kemmerling's sexual interests

but whether, on their face, they appear to be of a sexual character. If not, they are not illegal

under the statute, because they are not lascivious.").

The *Hillie* Approach: Objectively Sexual Conduct

Turenne argues we should reject application of the *Dost* factors, and adopt instead

the holding of the D.C. Circuit in *United States v. Hillie*, 39 F.4th 674 (D.C. Cir. 2022):

> Based on the foregoing, we construe "lascivious exhibition of the anus,
> genitals, or pubic area of any person" in 18 U.S.C. § 2256(2)(A)(v) to mean
> that the minor displayed his or her anus, genitalia, or pubic area in a manner
> connoting that the minor, or any person or thing appearing with the minor in
> the image, exhibits sexual desire or an inclination to engage in *any* type of
> sexual activity.

*Id.* at 685 (emphasis in original). The court purported to reach this conclusion through a

chain of U.S. Supreme Court precedent:

> In sum, [*New York v. Ferber*, 458 U.S. 747 (1982)] explained that the Court
> had previously construed the phrase "lewd exhibition of the genitals" in
> [*Miller v. California*, 413 U.S. 15 (1973)], and that the phrase referred to "the

16

hard core of child pornography." *Ferber*, 458 U.S. at 764–65, 773, 102 S.Ct. 3348. In [*United States v. X-Citement Video*, 513 U.S. 64 (1994)], the Court found that the term "lascivious exhibition of the genitals" as currently used in § 2256(2)(A)(v), has the same meaning as "lewd exhibition of the genitals," as that phrase was construed in *Miller* and *Ferber*. *X-Citement Video*, 513 U.S. at 78–79, 115 S.Ct. 464. And in [*United States v. Williams*, 553 U.S. 285 (2008)], the Court reaffirmed that § 2256(2)(A)'s definition of "sexually explicit conduct" means essentially the same thing as the definition of "sexual conduct" at issue in *Ferber*, except that the conduct defined by § 2256(2)(A) must be, if anything, more "hard-core" than the conduct defined by the New York law at issue in *Ferber*, given that the federal statute prohibits "sexually explicit conduct" rather than merely "sexual conduct," as in the state law. *Williams*, 553 U.S. at 296, 128 S.Ct. 1830.

*Hillie*, 39 F.4th at 683. Our analysis results in a different conclusion. The *Ferber* Court did not find "lewd exhibition of the genitals" in the child pornography standard equivalent to the phrase when construed in *Miller*, which was in the context of an obscenity standard for *adult* pornography. In fact, it appears the *Ferber* Court indicated the bar should be lower for finding the exhibition of genitals lewd when in the context of children:

> The test for child pornography is separate from the obscenity standard enunciated in *Miller*, but may be compared to it for the purpose of clarity. The *Miller* formulation is adjusted in the following respects: A trier of fact need not find that the material appeals to the prurient interest of the average person; it is not required that sexual conduct portrayed be done so in a patently offensive manner; and the material at issue need not be considered as a whole.

*Ferber*, 458 U.S. at 764. In fact, the *Ferber* Court's "adjustment" of the *Miller* standard for the child pornography context removes the requirement that *Hillie* and now Turenne argue for—that the image must be objectively sexual without regard to the mental state or preferences of the defendant.

17

We also highlight the last line of the *Hillie* court's explanation, citing the U.S. Supreme Court's conclusion in *Williams* that the conduct defined in the federal statute must be more "hard-core" than that defined in New York's statute, since the federal statute proscribes imagery of minors engaged in "sexually *explicit* conduct" while the New York statute proscribes imagery of minors engage in plain "sexual conduct." This reasoning would also weigh *in favor* of construing Maryland's statute more broadly than the federal standard, as it too proscribes imagery of minors engaged in any "sexual conduct"—not just "sexually *explicit* conduct."

Turenne also relies on *Hillie*'s rejection of the reasoning that lasciviousness could be found if an image "is designed to elicit a sexual response . . . perhaps not in the 'average viewer,' but perhaps in the pedophile viewer." *Hillie*, 39 F.4th at 688 (quoting *Dost*, 636 F. Supp. at 832). To reach this conclusion, the *Hillie* court says the U.S. Supreme Court previously rejected this reasoning in *Williams*. But again, we read *Williams* differently. There, the Court was reviewing the Eleventh Circuit Court of Appeals' holding that the federal statute criminalizing the possession and distribution of material pandered as child pornography was overbroad and thus unconstitutional. One of the underlying conclusions of the Eleventh Circuit Court of Appeals was "that the [federal] statute could apply to someone who subjectively believes that an innocuous picture of a child is 'lascivious.'" *Williams*, 553 U.S. at 301.

The U.S. Supreme Court disagreed:

That is not so. The defendant must believe that the picture contains certain material, and that material in fact (and not merely in his estimation) must

18

> meet the statutory definition. Where the material at issue is a harmless picture of a child in a bathtub and the defendant, knowing that material, erroneously believes that it constitutes a "lascivious exhibition of the genitals," the statute has no application.

*Id.* As we read *Williams*, the Court was not saying that, necessarily, only conduct which is objectively sexual will satisfy the federal statute. Rather, a picture that does not satisfy the statute by its terms will not be the subject of a statutory violation *even if* the defendant believes the picture qualifies as pornography. The focus in *Williams* was on the knowledge of the defendant. *Id.* at 300–01. The Court was not opining on whether an image of a child engaged in otherwise innocent conduct (versus objectively sexual conduct) would ever satisfy the statute. The Court was addressing the scenario where a defendant promises to send another person "child pornography," believing it is indeed pornographic, when in actuality the image does not constitute pornography under the terms of the statute—for example, a photograph of a child in a bathtub. As we see it, this is distinct from a someone taking or possessing an image solely focused on a child's genitals ostensibly during an innocuous activity like a diaper change.

This Court's Approach: Totality of the Circumstances

We decline to adopt the *Hillie* test Turenne urges for "lascivious exhibition," requiring "that the minor displayed his or her anus, genitalia, or pubic area in a manner connoting that the minor, or any person or thing appearing with the minor in the image, exhibits sexual desire or an inclination to engage in *any* type of sexual activity." *Hillie*, 39 F.4th at 685 (emphasis in original). First, as we have discussed, we do not find the legal analysis in *Hillie* persuasive. Second, we believe that limiting the construction of

"lascivious exhibition" to only those depictions that are objectively sexual would leave unprotected some of the most vulnerable minors—those who are too young to possibly emote sexual coyness or to be made to engage in an objectively sexual position.[7] We believe this runs counter to the General Assembly's ostensible intention in 2019 to broaden the reach of Maryland's child pornography statute to depictions of children that are not "stereotypical" instances of child pornography but are nonetheless harmful to and exploitative of children.[8]

---

[7] We find especially compelling the Ninth Circuit's position and reasoning for considering the adult-defendant's intentions in producing or possessing the depiction:

> In order to be lascivious, the exhibition must be pornographic, even if it need not be obscene. At the same time, it must be recognized that the type of sexuality encountered in pictures of children is different from that encountered in pictures of adults. This is because children are not necessarily mature enough to project sexuality consciously. Where children are photographed, the sexuality of the depictions often is imposed upon them by the attitude of the viewer or photographer. The motive of the photographer in taking the pictures therefore may be a factor which informs the meaning of "lascivious."

*United States v. Arvin*, 900 F.2d 1385, 1391 (9th Cir. 1990)

[8] *See United States v. Knox*, 32 F.3d 733, 747 (3d Cir. 1994) ("Children posing for pornographic pictures may suffer dramatic harm regardless of whether they have an "adult" look of sexual invitation or coyness on their face. Therefore, we adhere to the view that "lasciviousness". . . does not involve an inquiry concerning the intent of the child subject. Our interpretation of the "lasciviousness" element is consistent with the plain meaning of the statute and furthers Congress' intent in eradicating the pervasive harm children experience when subjected to posing for pornographic purposes.").

But we also decline to adopt the *Dost* factors for two reasons. First, even the *Dost* factors do not definitively resolve the issue of whether a depiction must contain overtly sexual conduct. The varying interpretations of the sixth factor among *Dost*-applying circuits are proof of this. We also agree with the criticism that the specific factors may be too limiting in light of the myriad forms that child pornography could take. Second, we do not need to adopt this test to resolve the case before us.

We find most persuasive the position of those circuits that have not embraced specific (and thus limiting) tests such as the *Dost* factors, nor the narrow, limiting position of the D.C. Circuit in *Hillie*. Rather, these circuits rely on the plain meaning of "lascivious exhibition" and apply a totality of the circumstances approach, which is most appropriate given the varied and nuanced contexts of child pornography. The Fourth Circuit has explained that "[t]he plain meaning of 'lascivious exhibition' requires that we ask whether the video depicts [the minor's] genitals or pubic area 'in order to excite lustfulness or sexual stimulation in the viewer.'" *Courtade*, 929 F.3d at 192 (quoting *Knox*, 32 F.3d. at 745 (3d Cir. 1994) (citing *Webster's* and *Black's Law*)). Answering this question requires consideration of all circumstances surrounding a depiction; not just the image itself, but the actions and preferences of the defendant. We find the summary of the approach and reasoning taken by the Eighth, Ninth, Tenth and Eleventh Circuits, as explained by the Eleventh Circuit Court of Appeals,[9] a useful guide for our own review:

---

[9] We emphasize that this 2016 opinion from the Eleventh Circuit, *Holmes*, supra, was issued years after its *Williams* opinion was reversed by the U.S. Supreme Court in 2008.

21

[W]e join each of our sister circuits who have addressed this issue and concluded that depictions of otherwise innocent conduct may in fact constitute a "lascivious exhibition of the genitals or pubic area" of a minor based on the actions of the individual creating the depiction.

The Eighth, Ninth, and Tenth Circuits have each confronted this same question. In considering whether an image constitutes a lascivious exhibition, those courts have looked to the intent of the producer or editor of an image. For example, in *United States v. Horn,* 187 F.3d 781 (8th Cir. 1999), the court held that "[b]y focusing the viewer's attention on the pubic area, freeze-framing can create an image intended to elicit a sexual response in the viewer. The 'lascivious exhibition' is not the work of the child, whose innocence is not in question, but of the producer or editor of the video." *Id.* at 790.

. . .

Similarly, the Ninth and Tenth Circuits have focused on the intent of the producer. The Ninth Circuit has made clear that the image at issue may be a lascivious exhibition based on how the photographer arranges it. "Each of the pictures featured the child photographed as a sexual object.... [T]hat is, so presented by the photographer as to arouse or satisfy the sexual cravings of a voyeur." [*Wiegand*, 812 F.2d at 1244]. The court continued, explaining, "[L]asciviousness is not a characteristic of the child photographed but of the exhibition which the photographer sets up for an audience that consists of himself or like-minded pedophiles." *Id.*

The Tenth Circuit has also reached this same conclusion. Citing the Ninth Circuit's decision in *Wiegand*, that court concluded that "[t]o find otherwise would ignore the obvious exploitive nature of the depiction and require the child to exhibit lust, wantonness, sexual coyness or other inappropriate precocity. Such an interpretation would pervert both the language and the logic of the legislation and the case law." *United States v. Wolf*, 890 F.2d 241, 246 (10th Cir.1989).

Today, we join the Eighth, Ninth, and Tenth Circuits and hold that a lascivious exhibition may be created by an individual who surreptitiously videos or photographs a minor and later captures or edits a depiction, even when the original depiction is one of an innocent child acting innocently.

*Holmes*, 814 F.3d at 1251–52. We will apply this totality of the circumstances approach, which incorporates the intent of the image's producer, to the instant case.

The relevant facts here, viewed in the light most favorable to the State, consist of the following: Regarding the content of the photos themselves, all are taken of female infants. Each photo is zoomed in to focus, indisputably, on the child's unclothed vagina as she lies on a changing pad or stands in a bathroom. The photos contain nothing else, aside from, in a few photos, the child's stomach and upper thighs. Most photos, if not all, do not depict any apparent diaper rash. None of the photos contain faces.

Regarding Turenne's motive for taking the photos, seven of the eight photos were taken at times in the evening after teachers would begin to leave the daycare for the day. Some were taken in the bathroom. No teacher would be in the bathroom if an aide, such as Turenne, was already in there with a child, because the teacher would be in the classroom with the rest of the children. Turenne initially lied to the investigators by stating that the photos were from the internet, not of children in the daycare. The reasoning she ultimately alleged for taking the photos—that she was documenting diaper rash—was not offered at the initial interview. Turenne also testified that she would be unable to identify a child based on the photos. The daycare's manager had never admonished any employees for not preventing or taking care of diaper rash, no parent had ever admonished Turenne for not preventing or taking care of diaper rash, and the daycare manager had never received any complaints from parents regarding diaper rash. Daycare employees were never instructed to document diaper rash care or prevention, and in fact, employees agreed to a policy that

23

prohibits taking pictures of children or using the employees' phones anywhere in the daycare other than the breakroom. Finally, one of the photos at issue depicted a child with underwear—not a diaper—pulled down.

The camera roll on Turenne's phone on which the photos were contained also contained adult pornography. It was an adult pornographic video that Turenne was showing to a co-worker when the co-worker discovered the eight photos at issue.

Based on the times and places the photos were taken, a reasonable juror could conclude that Turenne surreptitiously took the photos, and that she was discreet because she knew taking and possessing pictures of the children's vaginas was impermissible. A reasonable juror could infer Turenne's knowledge that what she did was impermissible and even morally—and perhaps legally—wrong, based on her initial lies to investigators about where the photos came from. A reasonable factfinder could conclude that Turenne was not credible when she claimed she took the photos to document diaper rash, based on the testimony that there had been no complaints of diaper rash among parents or staff at the daycare, and Turenne's own testimony that she would not have been able to identify any of the children from the photos if a parent were to complain about diaper rash.

A reasonable juror could also infer that Turenne took these photos for sexual gratification, based on the photos' exclusive focus on the children's vaginas and the absence of any credible, innocuous reason for taking and storing such photos, and the photos' location among other pornographic images on Turenne's phone.

24

These inferences, taken together, support the conclusion that the minors in the photos were engaged in lascivious exhibition of the genitals. Reaching this conclusion based on the aforesaid facts is consistent with the holdings of several federal circuits. For instance, in *Holmes*, the Eleventh Circuit affirmed the jury's verdict that

> [The defendant's] conduct—including placement of the cameras in the bathroom where his stepdaughter was most likely to be videoed while nude, his extensive focus on videoing and capturing images of her pubic area, the angle of the camera set up, and his editing of the videos at issue—was sufficient to create a lascivious exhibition of the genitals or pubic area.

*Id.* at 1252. Similarly, in affirming that images which had been cropped from photos of children bathing on a beach, could have been found to be lascivious beyond a reasonable doubt, the Sixth Circuit explained:

> The evidence showed that these images involved minors, . . . the focal point of the images was the children[']s genitalia, the children were partially clothed or nude, and these images were cropped and brightened from larger photographs that largely were innocuous. The jury could have reasonably inferred that the act of image editing, combined with the peculiar composition of the resultant images, demonstrated that the images were designed or intended to elicit a sexual response in the viewer.

*United States v. Stewart*, 729 F.3d 517, 527–28 (6th Cir. 2013). Particularly relevant to the photos Turenne produced and retained, the Sixth Circuit reasoned in *United States v. Brown* that the fact that the photographs at issue did

> not include the girls' heads is odd and repeated, and when considered together with the focus on the girls' pubic area, suggests that there may have been an inappropriate or lascivious focus.

579 F.3d 672, 681 (6th Cir. 2009). The Third Circuit likewise reasoned in *Knox*:

> In several sequences, the minor subjects, clad only in very tight leotards, panties, or bathing suits, were shown specifically spreading or extending

25

their legs to make their genital and pubic region entirely visible to the viewer. In some of these poses, the child subject was shown dancing or gyrating in a fashion indicative of adult sexual relations. Nearly all of these scenes were shot in an outdoor playground or park setting where children are normally found. Although none of these factors is alone dispositive, the totality of these factors lead us to conclude that the minor subjects were engaged in conduct—namely, the exhibition of their genitals or pubic area—which would appeal to the lascivious interest of an audience of pedophiles.

32 F.3d at 747. *See also United States v. Kemmerling*, 285 F.3d 644, 646 (8th Cir. 2002) ("A factfinder could decide . . . without being clearly wrong, that the other pictures are lascivious because they are of children who are nude or partially clothed, the focus of the images is the child's genitals or pubic area, and their purpose appears to be to elicit a sexual response from the viewer. These images were not designed, for instance, simply to provide a clinical view of the portions of the children's anatomy that are pictured."); *United States v. Johnson,* 639 F.3d 433, 440–41 (8th Cir. 2011) (holding that a reasonable jury could find that videos of minors weighing themselves in an examination room constitute lascivious exhibitions based on how the video was recorded, how the zoom feature was adjusted, and the producer's intent to elicit a sexual response in the viewer, even though the victims did not act in a sexual manner).

We conclude that viewing the evidence in the light most favorable to the State, a reasonable juror could have found the essential elements of the pornography charges—permitting a minor to engage as a subject in the production of a visual representation that depicts a minor engaged as a subject in sexual conduct by lascivious exhibition of the genitals of that minor, and retaining those same visual representations, CR §§ 11-207(a)(1) & (b)(2); CR § 11-101(d)—beyond a reasonable doubt.

26

## *Sexual abuse of a minor by "sexual exploitation"*

### A. Parties' Contentions

Turenne also asserts that there is insufficient evidence for finding that her taking of the photos constitutes "sexual exploitation" of the children. She posits that the conduct must have some sexual undertone, such that the person doing the exploiting is taking the action for his or her own sexual gratification. Turenne argues that there was no evidence to this effect.

The State says this argument mischaracterizes certain factors that have existed in past "sexual exploitation" cases as actual requirements for a finding of sexual exploitation. The State argues that both the case law and legislation emphasize how broad, not narrow, the statute is. The State also points once more to each of the factors it alleged in its "lascivious exhibition" argument to indicate Turenne took the photos for sexual gratification, and asserts that the innocuous reason Turenne advanced for taking the photos—her only means of demonstrating the photos were not exploitative—was discredited at trial and not believed by the jury.

### B. Analysis

Section 3-602(b)(1) of the Criminal Law Article states that

> A parent or other person who has permanent or temporary care or custody or responsibility for the supervision of a minor may not cause sexual abuse to the minor.

Section 3-602(a)(4)(i) provides that

> "Sexual abuse" means an act that involves sexual molestation or exploitation of a minor, whether physical injuries are sustained or not.

Turenne does not dispute the elements of her temporary care, custody or responsibility for the children in the photos, or that the children in the photos were minors. It is only whether her conduct satisfies the "sexual abuse" by "sexual exploitation" element that she challenges.

The Supreme Court of Maryland recently explained that "sexual exploitation is not limited to incidents involving physical contact and can include a wide range of behavior." *State v. Krikstan*, 483 Md. 43, 51 (2023). "The legislative history of the statute indicates an intent by the General Assembly that the statute be interpreted broadly to include a wide range of conduct and to protect children." *Id.* at 53. In explaining the meaning of the statute, the court quoted a previous opinion:

> Our review of Maryland case law leads us to several conclusions about CR § 3-602. The statute … can encompass a wide range of behavior that need not, in itself, be criminal. Child sexual abuse can be committed as part of a single act or a series of actions and it is not necessary that the defendant physically touch the child in order to commit the crime. The context in which the abuse occurs matters and failing to act to prevent abuse can be criminal. Finally, exploitation requires that the defendant "took advantage of or unjustly or improperly used the child for his or her *own* benefit."

*Id.* at 51–52 (quoting *Walker v. State*, 432 Md. 587, 622 (2013)) (emphasis in *Walker*). The statute prohibits a wider array of conduct than just child pornography or prostitution. *Id.* at 622.

In *Scriber v. State*, 236 Md. App. 332 (2018), this Court affirmed a high school teacher's conviction for sexual abuse by sexual exploitation, where he had taken photos of multiple female students' clothed buttocks. We explained that "assessing the sufficiency of evidence to support appellant's conviction for sexual abuse" of the victim

> requires consideration of all the circumstances, including the context in which the pictures were taken, i.e., appellant was a high school teacher and the minor-victim . . . was his student, and the content of the pictures, which the circuit court accurately described as multiple images of [the victim] "bending over, taking the picture from the back to the virtual exclusion of every other part of her body." The circuit court, in assessing the totality of the circumstances, concluded that this "was not an accident," particularly when considered with State's Exhibit 20, which included photos of another young woman, depicting only the "young woman's legs and buttocks." Viewing all of the evidence, the court found that "these pictures were taken to memorialize [the victim's] backside," and it determined that the evidence was sufficient to show that appellant's actions were exploitative. We agree.

*Id.* at 349–50.

To start, we agree with Turenne that there must be some sexual aspect to the conduct alleged to be exploitive. Our Supreme Court explicated this in *Walker*. 432 Md. at 616 ("Although the word 'sexual' is not placed in front of exploitation, and could be viewed as not modifying the term, the title of the statute itself, 'sexual abuse of a minor,' makes clear that the exploitation must be also of a sexual nature."). We also agree that the defendant must receive some benefit from the conduct for it to constitute "sexual exploitation." *Id.* at 625. And although that benefit need not be sexual gratification (it might be, for instance, a financial gain), *id.*, in the instant case, the benefit to Turenne argued by the State was sexual gratification. Turenne's response is that her "actions of taking the photos do not constitute

sexual exploitation because the photos themselves do not have a sexual undertone and there is no evidence that the photos were taken for [her] own gratification."

Turenne's response ignores that it was for the jury to determine whether there was a sexual aspect to her taking and/or possessing the photos. Relatedly, Turenne's argument ignores that the State presented evidence, even if circumstantial, that Turenne received sexual gratification for taking and/or possessing the photos—the combination of the surreptitious manner in which she took the photos, the photos' location in her camera roll among adult pornography, that she shared some of that adult pornography on her phone with a co-worker, and the absence of any credible, innocuous reason for taking photos of children's genitalia in violation of the daycare's policy. The evidence of her sexual gratification may not have been direct, as it was in *Schmitt v. State*, 210 Md. App. 488, 491–92 (2013) where the defendant masturbated with the minor's clothing on camera, but we have found no case holding such evidence is *required* for finding sexual exploitation. Generally, our case law teaches that "[c]ircumstantial evidence is entirely sufficient to support a conviction, provided the circumstances support rational inferences from which the trier of fact could be convinced beyond a reasonable doubt of the guilt of the accused." *Neal v. State*, 191 Md. App. 297, 314–15 (2010) (quoting *Hall v. State*, 119 Md. App. 377, 393 (1998)).

This case is similar to *Scriber*, particularly in Turenne's effort to undermine the State's case for "sexual exploitation." In *Scriber*, there was no direct evidence of a benefit

the teacher received for taking the photos, but the trial judge explained that he could conceive of

> no value reason where a high school teacher would be using his cellphone, face down, camera up, while dealing with a student in a dress standing over him.
>
> No satisfactory explanation has been given to me. I can think of none. And it's my job to try to find a reasonable doubt here.... I can think of no reason why, given [the victim's] testimony, which I found absolutely credible, the [appellant] would have been doing anything other than trying to take her picture. So, I find the [appellant] guilty of Count 1.

236 Md. App. at 341. Interestingly, Turenne references these statements as support for her position—that because she *did* provide a reason for taking the photos (documenting diaper rash), her case is distinguishable from *Scriber*. To the contrary, *Scriber* supports the jury's finding that Turenne committed sexual exploitation. Although at trial Turenne provided an explanation for taking the photos, a rational factfinder could have found it incredible (for reasons discussed at length earlier), which is, in fact, what the jury did. In *Scriber*, the factfinder also found there was "no satisfactory explanation" for the defendant taking and possessing the photos, other than for sexual gratification. And while we do not hold that this logic would apply to every case where sexual abuse by sexual exploitation is alleged, it is applicable here, where the totality of circumstances surrounding Turenne's taking and possession of the photos, as well as their content, lend themselves to no other credible explanation. In sum, we cannot say that *no* rational factfinder could have found beyond a reasonable doubt that Turenne's taking of photos of infants' bare vaginas, and her

31

possession of those photos among adult pornography on her phone, had a sexual aspect, and that she derived sexual gratification from that conduct.

## II. Jury Instructions on Elements of Offenses – Plain Error

**Standard of Review**

Although Turenne did not object at trial to either of the errors she now alleges regarding jury instructions, she argues that we can and should exercise plain error review to reverse the trial court on this basis.

We rarely engage in plain error review. It is "reserved for those errors that are compelling, extraordinary, exceptional or fundamental to assure the defendant of a fair trial." *Newton v. State*, 455 Md. 341, 364 (2017) (quoting *Robinson v. State*, 410 Md. 91, 111 (2009)).

> Before we can exercise our discretion to find plain error, four conditions must be met: (1) "there must be an error or defect—some sort of 'deviation from a legal rule'—that has not been intentionally relinquished or abandoned, *i.e.*, affirmatively waived, by the appellant"; (2) "the legal error must be clear or obvious, rather than subject to reasonable dispute"; (3) "the error must have affected the appellant's substantial rights, which in the ordinary case means he must demonstrate that it 'affected the outcome of the district court proceedings'"; and (4) the error must "seriously affect the fairness, integrity or public reputation of judicial proceedings."

*Id.* (quoting *State v. Rich*, 415 Md. 567, 578 (2010)) (cleaned up). Our courts have found serious errors in jury instructions to be plain error when they "undermined a core value of constitutional criminal jurisprudence." *Id.* (quoting *Savoy v. State*, 420 Md. 232, 255 (2011)). Such plain error has been found when, for example, the court erred in its reasonable doubt instruction, *Savoy*, 420 Md. at 255; when it failed to instruct the jury that

they could find the defendant not guilty, *State v. Hutchinson*, 287 Md. 198, 208 (1980); and when its instruction placed the burden of proving self-defense on the defendant, *Squire v. State*, 280 Md. 132, 133 (1977). Likewise, we have declined to find plain error, for instance, when jury instructions omitted intellectual disability as a basis for finding insanity and thus that the defendant could be found not guilty. *Trimble v. State*, 300 Md. 387, 399, (1984).

## A. Parties' Contentions

Turenne asserts that the court plainly erred by "failing to adequately instruct the jury on the distinct actus rei" for child sex abuse, production of child pornography, and possession of child pornography, and that the court's failure to answer the jury note before the court received the verdict compounded that error. Specifically, Turenne says the court's instruction regarding the child pornography charges—that sexual conduct is defined as "lascivious exhibition of the genitals or pubic area of any person"—failed to give the jury context or define "lascivious exhibition." The court could have rectified that shortcoming, according to Turenne, by providing the *Dost* factors as the federal pattern jury instructions do, or by listing lascivious exhibition as one of the forms of sexual conduct listed in the statute to provide context.

Similarly, regarding the court's instruction for the sexual abuse charge, Turenne posits that its failure to explain what constitutes "sexual exploitation" was error. Turenne points out that the pattern jury instructions include such an instruction, and that Maryland courts favor the use of pattern jury instructions. The jury's question demonstrated its lack

of clarity and its assumption that if the evidence was sufficient to convict Turenne of child sex abuse, it was sufficient to convict her of the pornography charges. Turenne concludes that the court was required to provide further instruction, and its failure to do so, compounding its failure to instruct properly initially, deprived her of a fair trial.

The State counters that Turenne's claims fail to meet the four prongs of the plain-error test articulated in *State v. Rich*, 415 Md. 567, 578 (2010). First, the State says, defense counsel affirmatively waived both claims. Second, Turenne fails to establish that the error is clear or obvious; she does not affirmatively say what instruction should have been given, cites no cases finding error for failure to use these pattern instructions, nor any Maryland cases finding plain error for failing to use a federal pattern instruction. Further, the State adds, the "sexual exploitation" definition Turenne cites is designated as a "may be helpful"—not a mandatory—definition. Third, Turenne fails to establish that the failure to give more detailed instructions affected the jury's verdict, and finally, she fails to establish that an exercise of the trial court's discretion in giving more detailed instructions, both initially and after receiving the jury's note, would have been appropriate. The State asserts it would have been inappropriate, as Defense counsel's failure to object in both instances might have been a strategic choice. And specifically, regarding the court's failure to address the jury's note, the State says the jury's reaching of a verdict before then "essentially communicated that they were no longer confused about the question."

**B. Analysis**

We decline to exercise plain error review of Turenne's claim regarding jury instructions. At a minimum, Turenne's challenge to the absence of a "lascivious exhibition" definition fails at the second plain error review prerequisite: the alleged error is not so clear or obvious to be beyond dispute. As our earlier discussion made painfully clear, no Maryland law has established a precise definition for "lascivious exhibition," much less required that the phrase be further defined or contextualized for the jury.[10]

Regarding a definition of "sexual exploitation," Turenne is correct that the Maryland Pattern Jury Instructions provide one. However, as Turenne also acknowledges, following the pattern instructions is not mandatory. *Cousar v. State*, 198 Md. App. 486, 521 (2011).[11] And in the case of this phrase and the associated pattern definition—"Sexual exploitation means that a person takes advantage of or unjustly or improperly uses the minor for [his][her] own benefit[,]" MPJI-Cr 4:07.2 CHILD ABUSE--SEXUAL ABUSE[12]—we cannot easily imagine, nor does Turenne demonstrate, how providing that definition to the jury might have affected the outcome of the case. This definition seems

---

[10] *See Arvin*, 900 F.2d at 1391 ("The distinction between a pornographic depiction and an innocent one is a distinction the jury should be able to make from its own experience. How much instruction should be given beyond telling the jurors that they must find the statutory imperatives and must use their common sense to decide whether the pictures are lascivious is essentially up to the discretion of the judge.").

[11] We do, of course, continue to encourage the use of pattern jury instructions where applicable. *See, e.g.*, *Johnson v. State*, 223 Md. App. 128, 152 (2015).

[12] This definition came from this Court in *Brackins v. State*, 84 Md. App. 157, 162 (1990).

rather straightforward in that it does not stray from the plain meaning of "exploitation."[13]

We hold that the court's failure to provide this optional definition does not clear the second or third perquisites to plain error review.

### III. The State's mention of Turenne's sexual orientation in closing argument

#### A. Parties' Contentions

Turenne asserts the court plainly erred by allowing the prosecutor to comment on her adult same-sex attraction, because sexual orientation is not an element of the offense of child sex abuse, and its mention served only to inflame the jury. Turenne cites to this Court's opinion in *Killie v. State*, 14 Md. App. 465, 470–71 (1972), where we held, in

---

[13] In fact, in *Brackins*, this Court reviewed several definitions of "exploitation" prior to arriving at the phrase now used in the pattern definition for "sexual exploitation":

"To take advantage of.... To make use of meanly or unjustly for one's own advantage or profit.... Unjust or improper use of another person for one's own profit or advantage." *Webster's Third New International Dictionary, 1976 Edition.*

"To make use of.... To make unethical use of for one's own advantage or profit." *Webster's New World Dictionary, Third College Edition* (1988).

"Taking unjust advantage of another for one's own advantage or benefit." *Black's Law Dictionary* (5th Ed., 1979).

"The utilization of another person for selfish purposes.... To employ to the greatest possible advantage (exploit).... To make use of selfishly or unethically." *The American Heritage Dictionary of the English Language* (1969).

84 Md. App. at 161.

Turenne's words, "that the State's reference to the defendant's sexual orientation and insinuating his interest in young boys was likely to prejudice the jury, and therefore denied the defendant a fair and impartial trial." Turenne also cites to a Fourth District California Court of Appeal opinion holding that a prosecutor's repeated reference to the appellant's sexual orientation in a same-sex abuse case was prejudicial misconduct.

The State counters that its comments were in the permissible scope of closing argument. The State says *Killie* is distinguishable from the instant case, since there, the State introduced the notion of the defendant's sexuality for the first time in closing. The State also disputes the relevance of the California case, explaining that it is not binding on this Court and so it cannot be used to establish that any error of the trial court in neglecting to stop the State from mentioning Turenne's sexual orientation was obvious or clear. The State also details four ways the case is distinguishable from the instant case.

## C. Analysis

In the prosecutor's closing argument, she said the following about Turenne's sexual orientation:

> So you can consider other things beyond the picture, just the circumstances, the fact that these are all females. It's interesting that apparently no boys had rashes at the time. She told one of her friends that she was gay or bisexual, which obviously doesn't matter, but it matters when you're looking at whether she had any sexual gratification for taking these pictures, holding on to these pictures for as long as she did.

In his closing, defense counsel said of the State's argument, "[t]hey want you to just assume that automatically the photo means there was a sexually-based intent[,]" and argued

37

that the photos themselves, as well as all the adult pornographic photos, actually helped Turenne's case. Defense counsel stated that although he could have objected and said all the photos were too prejudicial, he chose not to because he

> …wanted you all to see that because, again, there's nothing to hide in this case.
>
> [Turenne's] preferences are in men and women. Now, the State is saying that she was gay and look at the pictures and they're trying to imply that because you're gay somehow you then become an abuser.
>
> But here's the thing they don't mention. There's pictures of male genitalia, too, of adult male genitalia. They don't mention that. They're making the argument that she's gay, but she has male genitalia in these pictures. And she even said herself, I'm bisexual.

In rebuttal, the prosecutor responded to defense counsel on the issue Turenne's intent:

> I think the intent and the way they take these pictures is what speaks for itself. So if you're zooming in on a child's crotch, if you're taking a picture of a child under their skirt, we're not presenting this is playful. I think the intent is obvious. So it seems silly to spend a lot of time talking about the intent. And we keep talking about the fact that she's a young woman. If we were looking at an older male and he had a bunch of pictures of young children's vaginas or penises on his phone, would we need to spend this much time on what the intent was?
>
> It just seems ridiculous to me that we are arguing it for that long, what the intent is, because it seems obvious.
>
> There's no inference made by the fact that she would be gay or bisexual. That's irrelevant. The only reason we're considering that is the inference that she had sexual gratification and that that connects to the pictures themselves. That's why it becomes relevant. Nobody is making any inference from it.
>
> The only reason it was brought out is, again, to consider the sexual, or potential sexual gratification that she's getting from these pictures.

We reiterate the four prerequisites to plain error review:

(1) An error or defect that has not been affirmatively waived by the appellant;

(2) The legal error is clear or obvious, and not subject to reasonable dispute;

(3) The appellant has demonstrated that the error affected the outcome of the proceedings; and

(4) The error seriously affects the fairness, integrity or public reputation of judicial proceedings.

*Newton*, 455 Md. at 364 (internal citations and quotations omitted). We add that "this Court is reluctant to find plain error in closing arguments," particularly when "there [is] ample evidence against the defendants and the arguments [do] not vitally affect their right to a fair trial." *Lawson v. State*, 389 Md. 570, 605 (2005) (internal quotations and citations omitted).

Once more, we decline to exercise plain error review. We conclude that Turenne's challenge to the prosecutor's comments fails the second prerequisite to plain error review, because the error is not so clear or obvious to be beyond reasonable dispute. We conclude the impact of the prosecutor's comments, particularly her rebuttal, though mentioning Turenne's sexual orientation, focused on explaining Turenne's interest in female children. In other words, the prosecutor was not arguing that Turenne was probably a child abuser because she was lesbian or bisexual, but rather that her sexual attraction to women might mean that she was sexually attracted to girls—which in turn, would explain the photos she took exclusively of female infants' genitalia. Though this point is debatable, it is not plainly wrong, particularly in the absence of an objection and given the substantial latitude that lawyers have in closing argument. *Lee v. State*, 405 Md. 148, 162 (2008).

Further, we conclude that Turenne's challenge does not meet the third prerequisite, because Turenne did not demonstrate how the comments affected the verdict. Even if the prosecutor had not referenced Turenne's sexual orientation, the jury had already heard Miller's testimony that Turenne said she was attracted to women, Turenne's testimony that she was bisexual or confused as to whether she was attracted to women or men, and Detective Rockwell's testimony that her phone contained both male and female pornography. The jury was also aware that all the photos were of female infants. Even without the State's closing comments, the jury had the evidence from which it might have inferred that Turenne was attracted to female children and took the photos for sexual gratification.

Though we reach these conclusions, we note that the prosecutor's comments could be misinterpreted. Linking one's sexual orientation, particularly a same-sex orientation, to sexually abusing children is a canard that reinforces a terrible stereotype of gay and lesbian people. We think the prosecutor's comments, though perhaps unintentional, came dangerously close to perpetrating a pernicious falsehood about same-sex orientation and should be avoided.[14]

---

[14] One's sexual orientation has little to do with sexual attraction to children of either sex. Of the many informative websites on this topic is: https://www.nationalcac.org/wp-content/uploads/2018/02/CSA-Perpetrators.pdf.

Concluding that the circuit court did not commit reversible error on any of the preserved grounds alleged by Turenne, we affirm.[15]

**THE JUDGMENT OF THE CIRCUIT COURT FOR WICOMICO COUNTY IS AFFIRMED. APPELLANT TO PAY THE COSTS.**

---

[15] Finally, we note that a post-conviction proceeding is perhaps the most effective way for Turenne to address the perceived deficiencies in defense counsel's performance in not objecting to either the jury instruction or the prosecutor's allegedly biased comment in closing argument.